**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 23-cr-375 (CRC)** |
| **v.** | : | |
| | : | |
| **ELLIOT WILLIAMS,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Elliot Williams to 90 days of incarceration followed by one year of supervised release. The government also requests that this Court impose 60 hours of community service, and consistent with the plea agreement in this case, $500 in restitution.

I.      **Introduction**

Defendant Elliot Williams, a factory worker from Washington State, was 18 years old on January 6, 2021. Williams was an eager participant in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The

By his own account, on January 6, Williams "stormed the Capitol." He entered the Capitol building through the Senate Wing Doors just 14 minutes after the initial breach. While inside, Williams walked through corridors of what were obviously private office spaces. He then "got into Congress hall" (the Senate Gallery), where he remained for several minutes and was filmed joining a group of rioters shouting "Traitor! Traitor!" He communicated with other rioters who had jumped to the Senate floor below. After exiting the Capitol building a first time, and despite clear and obvious signs that he should not be there, he "had a pushing match with the police" and "got in a second time." He was among the last rioters to leave the Rotunda when he was directed out by police at 3:27 p.m. In total, Williams was inside the Capitol for roughly 38 minutes on January 6. Later in the evening on January 6, Williams texted a friend that his purpose for going inside the U.S. Capitol was to encourage Congress to object to the certification of the Electoral College votes.

Williams could have been charged with additional criminal conduct, including Obstruction of Justice, when he admitted that he went inside as part of a violent mob to encourage Congress to object to the results of the certification. The seriousness of his actions on January 6 warrant a meaningful sentence—a sentence that will deter him from criminal conduct in the future. Here, the facts and circumstances of Williams' crime support a sentence of 90 days of incarceration followed by one year of supervised release.

---

Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

## II.      Factual and Procedural Back]ground

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 19 (Statement of Offense) ¶¶ 1–7.

### *Williams' Role in the January 6, 2021 Attack on the Capitol*

Williams arrived in Washington, D.C. from Spokane, Washington, in the early morning on January 6, 2021. Williams attended the "Stop the Steal" rally near the Ellipse, and after hearing the former President speak, walked with the crowd towards the U.S. Capitol building. As he approached the Capitol building, Williams could see police taking crowd disbursal measures, including using chemical irritants and shooting rubber bullets. ECF 19 ¶ 9.

Williams entered the U.S. Capitol through the Senate Wing Door at approximately 2:26 p.m., roughly 13 minutes after the Capitol building was first breached. After entering, he followed the crowd and moved quickly towards the Crypt, which he entered at 2:27 p.m. ECF 19 ¶ 10.



*Image 1: Williams entered the U.S. Capitol through the Senate Wing Door at 2:26 p.m.*



*Image 2: Williams moved quickly towards the Crypt. (Image from Williams' phone)*

By roughly 2:35 p.m., Williams had made his way up a flight of steps and into the Rotunda, which he quickly exited near a set of exterior doors.





*Images 3-4: Williams walked quickly through the Rotunda before exiting at 2:37 p.m.*

From there, Williams walked through interior hallways of clearly private offices spaces, and continued on until passing through the Ohio Clock Corridor at roughly 2:39 p.m., where he could see other rioters engaging with police. While near the Corridor, Williams opened a closed cabinet to find tissues to wipe chemical irritants out of his eyes. ECF 19 ¶ 10.



*Image 5: CCTV footage showed Williams walked through hallways of clearly private office space.*

Williams continued onwards, and following other rioters, entered the Senate Gallery at approximately 2:43 p.m.



*Image 6: Williams approaching the Senate Gallery.*

Inside the Senate Gallery, Williams joined a large group of rioters who had gathered there, and enthusiastically joined them in chanting, "Treason! Treason!" Many of those in the Gallery exited after just a couple of minutes, and some re-appeared on the Senate Floor. Williams watched as a few rioters jumped to the Senate Floor, but Williams remained in the Gallery.



*Image 7: [Sent. Exh. 1 at 00:20-00:30]: Williams chanting in the Senate Gallery.*

In CCTV footage, which was recorded without sound, Williams was filmed leaning over the balcony and shouting to the rioters who had jumped to the Floor, though it is not possible to understand what he was saying.



*Image 8: [Sent Exh. 2 at 001:25] Williams communicating with rioters on the Senate Floor.*

Williams remained in the Gallery for roughly six minutes. At approximately 2:49 p.m., he exited the Senate Gallery and walked towards the Senate Carriage Door, where he exited the Capitol building at 2:50 p.m.



*Image 9: Williams exiting the Capitol building the first time.*

Williams soon after re-entered the Capitol building through the Rotunda Doors at 3:14 p.m., at a moment when many rioters were beginning to exit out through those same doors as police had begun to push them out of the Rotunda. Williams remained in the Rotunda for 13 minutes, despite clear and obvious signs that he should leave. During this time, Williams was part of a group that attempted to move further inside the Capitol building.



*Image 10 : Williams re-entered the U.S. Capitol by the Rotunda Doors as other rioters were leaving.*

In CCTV footage and in videos taken by other rioters, it was obvious that police were struggling to push rioters out the Rotunda, leading to numerous physical altercations. In a video taken by another rioter [Sent. Exh. 3], Williams could be seen smiling and appearing to enjoy himself amidst the chaos. CCTV footage showed that Williams was one of the last rioters to finally exit the Rotunda, which he did at roughly 3:27 p.m.  During his two entries, Williams was inside the Capitol building for roughly 38 minutes.



*Image 11 (top) [Sent. Exh. 3 at 00:25-00:50]: Williams appearing to enjoy himself as police struggled to clear the Rotunda.  Image 12 (bottom): Williams was one of the last rioters to leave the Rotunda at 3:27 p.m.*

*Williams' Text Messages*

Williams had brought a cell phone with him to Washington, D.C., and during his trip, he sent text messages to a friend. His phone battery died shortly after the former President's speech at the Ellipse, though Williams texted his friend later that evening at his hotel. After his friend inquired, "You good?" Williams texted back, "I am all good. My phone died. I stormed the Capitol and got tear gases haha." The friend then asked Williams, "What did you do!?" Williams texted

back, "Just went in and chanted. Took some pictures and stuff. Also had a pushing match with the police. Trump supporters won that lol and got in a second time."

Williams' friend asked, "Wait so why are you fighting the police?", to which Williams responded, "They wouldn't let us in the Capitol the second time but was OUR HOUSE." When asked why he went into the Capitol, Williams texted, "Encouraging the congress to object the results." Williams also told his friend that "one lady got shot" and he "saw her bloody self being carted out." Williams' friend texted that the rally "look[ed] so bad" on the news, to which Williams responded, "Ya it really wasn't that bad. Antifa protests are way worse."

*Williams' Pre-Arrest Interviews with the FBI*

Williams agreed to be interviewed by the FBI prior to his arrest, and he was cooperative and forthcoming in his description of events. In the interview, Williams told agents that he had been hearing from media sources about the "Stop the Steal" rally and made the decision to fly to Washington, D.C. at the last minute after finding cheap airline tickets online. Williams flew alone from Spokane in the evening on January 5, and arrived at the airport near D.C. in the early morning on January 6. Williams met others at the airport who were heading to the rally, and they booked a rideshare into the city.

Williams attended the "Stop the Steal" rally near the Ellipse, and after hearing the former President speak, walked with the crowd towards the U.S. Capitol building. As he approached the Capitol building, Williams witnessed physical confrontations between rioters and police, and he could see police deploying chemical irritants and shooting objects into the crowd.

Williams told agents that he entered the Capitol building as part of a large crowd, and that when he entered, police officers near the doors did not indicate that people were not permitted to

enter. He claimed to see Ashli Babbitt be carried out of the U.S. Capitol building on a stretcher. Williams stated that he exited the Capitol building the first time because the hallways were too full of people, and he wanted to find less crowded access points. Williams admitted to entering the Capitol a second time. Williams' phone battery died early in the day on January 6, and he was unable to take photos or send text messages until he went to his hotel in Alexandria, Virginia, later that evening.

*The Charges and Plea Agreement*

On October 26, 2023, the United States charged Williams by a four-count Information with violating 18 U.S.C. § 1752(a)(1), Entering and Remaining in a Restricted Building or Grounds; 18 U.S.C. § 1752(a)(2), Disorderly and Disruptive Conduct in a Restricted Building or Grounds; 40 U.S.C. § 5104(e)(2)(D), Disorderly Conduct in a Capitol Building or Grounds; and 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. On November 11, 2023, pursuant to a plea agreement, Williams pleaded guilty to Count Two of the Information. By plea agreement, Williams agreed to pay $500 in restitution to the Architect of the Capitol.

### III.    Statutory Penalties

Williams now faces a sentencing for violating 18 U.S.C. § 1752(a)(2). As noted by the plea agreement and the U.S. Probation Office, Williams faces up to one year of imprisonment and a fine of up to $100,000. He must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49.

The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR.

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2A2.4) | 10 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| Total Adjusted Offense Level | 8 |

*See* PSR at ¶¶ 34-41.

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. While the government concedes that Section 4C1.1 applies to Williams, the Court should vary upward by two levels to account for the reduction under 4C1.1.

An upward variance is necessary because the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g., United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption.  Because [the defendant's] presence and

conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions"). Thus the defendant's conduct caused a significant disruption to a vital governmental function, warranting an upward variance. *See United States v. Eicher*, No. 22-cr-038 (BAH), Sentc'g Hrg. Tr. at 48 (varying upward by two levels to offset the Section 4C1.1 reduction).

Moreover, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack. *See, e.g.*, *United States v. Little*, No. 21-cr-315 (RCL), ECF No. 73 at 4 ("The Court is accustomed to defendants who refuse to accept that they did anything wrong. But in my thirty-seven years on the bench, I cannot recall a time when such meritless justifications criminal activity have gone mainstream.").

Moreover, the defendant could have been charged with additional criminal conduct, including Obstruction of Justice, when he admitted that he went inside as part of a violent mob to encourage Congress to object to the results. *See supra*, at 10. While this fact alone does not change the guidelines or sentencing process, it should calibrate the Court as to whether this was truly a crime where the lack of violence merits such an application.

The U.S. Probation Office calculated Williams' criminal history as a Category I. PSR at ¶ 46. Accordingly, the U.S. Probation Office calculated Williams' total adjusted offense level, after acceptance, at 6, and his corresponding Guidelines imprisonment range at 0-6 months. PSR at ¶ 76. Williams' plea agreement contains an agreed-upon Guidelines' calculation that is the same as the U.S. Probation Office's calculation.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 90 days of incarceration and one year of supervised release.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Williams'

participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Williams, the absence of violent or destructive acts is not a mitigating factor. Had Williams engaged in such conduct, he would have faced additional criminal charges.

The most important factor in Williams' case was his decision to enter the U.S. Capitol on January 6 with the goal of disrupting the certification of the Electoral College votes. In furtherance of this goal, Williams moved throughout the Capitol building. Once in the Senate Gallery, he chanted "Treason! Treason!" while encouraging other rioters who had jumped down to the Senate Floor.

Even after exiting the Capitol building the first time, Williams chose to re-enter a second time. He did this after seeing a body be carried out on a stretcher and when it was very clear that he was not permitted to be there. Williams had many warnings that he should not be at the U.S. Capitol on January 6; he ignored all of them. Twice.

Indeed, the defendant's conduct was aggravating, and the fact that he was permitted to plead guilty to misdemeanors should not undercut the nature of the crime or the severity of his actions.

**B.  Williams' History and Characteristics**

Williams was 18 years old on January and has no criminal history. The government can and should consider mitigation in crafting an appropriate recommendation. Here, the defendant was young compared to some others involved in the riot, and according to the defendant, he has certain medical or psychological conditions that support leniency. But on the same token, the PSR carefully assesses the impact of this, noting that he has never before been treated or seen for such problems. Moreover, this argument presupposes that if Williams was afflicted with some disorder,

that the disorder is such that it had an effect on his conduct and should be used as a factor at sentencing. Without more information, the government cannot endorse any additional leniency, particularly in light of the aggravating nature of this crime. The defendant, although young, knowingly joined a mob bent on disruption, and ended up in the very chamber necessary to certify a presidential election, chanting and screaming along.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be

deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Williams has accepted responsibility by cooperating with the FBI agents who investigated this case and then quickly pleading guilty. While the government credits Williams for his decisions to plead guilty, the government remains concerned that Williams lacks maturity and proper decision-making skills. Williams observed and ignored many warning signs on January 6—penetrating the Capitol building and making his way to the Senate Gallery, where he encouraged other rioters who had jumped down to the Senate floor. The government remains concerned that Williams, given his lack of maturity, could commit similar crimes the next time his preferred presidential candidate does not win an election.

Williams continues to state that police let rioters into the Capitol building, which is patently false. He has stated that police acted as "tour guides." He has claimed that he entered a second time after being pushed by the crowd. Indeed, more than two years after January 6, Williams continues to not appreciate the seriousness of the event, nor his role in it. A meaningful sentence—in this case, a period of incarceration, is necessary for specific deterrence.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as

in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[2] This Court must sentence Williams based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Williams has pleaded guilty to Count Two, 18 U.S.C. § 1752(a)(2), Disorderly and Disruptive Conduct in a Restricted Building or Grounds. This offense is a Class A misdemeanor. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, other judges of this court have sentenced Capitol breach defendants who spent time in other sensitive places within the Capitol.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d

---

[2] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

In *United States v. Richard Michetti*, 21-cr-232 (CRC), the defendant pleaded guilty to 18 U.S.C. § 1512(c)(2). Michetti entered the U.S. Capitol and quickly made his way to the Rotunda and then the Old Senate Chamber, where he joined a group of rioters who were in a standoff with police. During that standoff, Michetti yelled at police, telling them to stand down and calling them "fucking animals." Michetti resisted efforts to leave the hallway, until police used chemical irritants to disburse the crowd.

Although Michetti pleaded guilty to a felony while Williams pleaded guilty to a Class A misdemeanor, the two defendants' crimes are similar in various ways. Michetti and Williams were inside the Capitol for roughly the same amount of time—roughly 40 minutes. Like Michetti who remained in the hallway by the Old Senate Chamber, Williams clearly ignored police commands to leave the Capitol building when he decided to enter a second time, and then remain in the Rotunda as police tried to clear the area. Williams did not yell at police like Michetti did, but he boasted to a friend by text that there was a "pushing match with police. Trump supporters won that. LOL." Both defendants expressed concerns about the results of the presidential election in texts to friends—Michetti repeatedly alleged election fraud, while Williams was clear that he went

to the Capitol to protest the certification. This Court sentenced Michetti to nine months of incarceration followed by two years of supervised release. Williams has benefitted significantly from concerns about his youth and lack of maturity during the prosecution of this case. He was not charged with felony obstruction of an official proceeding, but easily could have been. A significant sentence is therefore still warranted in his case.

In *United States v. James Rahm III*, 21-cr-585 (CRC), the defendant pleaded guilty to 18 U.S.C. § 1752(a)(2) and was sentenced by this Court to 45 days of incarceration and one year of supervised release. Both Rahm and Williams approached the Capitol building and ignored clear and obvious signs that they should not be there, including chemical irritants and other crowd disbursal measures. Both defendants were inside the U.S. Capitol for roughly 45 minutes. Rahm joined crowds that tried to push past police officers in the Crypt and by the East Rotunda Doors; Williams, by contrast, was part of a crowd that refused to leave the Rotunda and he later bragged to a friend about pushing police. Both defendants entered extraordinarily sensitive spaces-- Rahm entered then-Speaker Pelosi's office suite, while Williams entered the Senate Chamber. Williams' conduct on January 6—including his entry into the Senate Gallery and his explicit intent to protest the certification, was altogether more aggravated than Rahm's.

In *United States v. Gracyn Courtright*, 21-cr-72 (CRC), the defendant pleaded guilty to 18 U.S.C. § 1752(a)(1) and was sentenced by this Court to 30 days of incarceration and 1 year of supervised release. Similar to Williams, Courtright ventured into the Senate Chamber. Courtright walked onto the Senate Floor, while Williams was in the Gallery. Both defendants witnessed violence against police outside the Capitol building, but undeterred, decided to enter anyways. Both defendants made statements after January 6 – Williams to a friend via text and Courtright on her social media account, that showed a lack of remorse and minimized the violence that occurred

on January 6. Williams' conduct on January 6 was more aggravated than Courtright's because he entered the Capitol twice and was explicit in his intent to disrupt the certification.

### F. Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[3] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Williams must pay $500 in restitution, which reflects in part the role Williams played in the riot on January 6.[4] Plea Agreement at ¶ 84. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in

---

[3] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C.  § 3663A(c)(1).

[4] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Williams' restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 98.

## V.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Williams to 90 days of incarceration followed by one year of supervised release, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Williams' liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    */s/ Melanie Krebs-Pilotti*
Melanie Krebs-Pilotti
Trial Attorney- Antitrust Division
Cal Bar. No. 241484
601 D St., NW
Washington, D.C. 20001
melanie.krebs-pilotti2@usdoj.gov
(202) 870-7457