J. Stephen Roberts, Jr.
Federal Defenders of Eastern Washington and Idaho
601 W. Riverside Ave., Ste. 900
Spokane, Washington 99201
(509) 624-7606

Attorneys for Mr. Williams

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA
The Hon. Christopher R. Cooper

| | |
|---|---|
| United States of America, | No. 1:23-cr-375-CRC-1 |
| Plaintiff, | **Sentencing Memorandum** |
| v. | |
| Elliot Patrick Williams, | |
| Defendant. | |

Elliot P. Williams submits for the Court's consideration the following Sentencing Memorandum and Exhibits A-B. [1] [2]  For the reasons set forth below, Mr. Williams requests the Court impose a sentence of:  time-served, followed by one (1) year of

---

[1] Exhibit A consists of character letters submitted to the Court by Mr. Williams' family, employer, girlfriend, and former teacher: Colonel Patrick J. Williams, USAF-Ret. (Father), Leslyn Rowley (Mother), Marc Taylor (Employer), Desiree Rose (Girlfriend), and Keith Ross (former Math Teacher).

[2] Exhibit B consists of a Psychological Evaluation dated March 17,2024. Exhibit B is filed with the Court under seal.

supervised release, no criminal fine, a $25 special penalty assessment; and restitution in the amount of $500.

### Guideline Calculations

Mr. Williams has no outstanding objections and agrees with the advisory Guideline Range as calculated in the final Presentence Investigation Report ("PSR"), ECF No. 24 at ¶¶ 33-43. The Guideline Range in the PSR based on his guilty plea to a single count of Disorderly and Disruptive Conduct in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(2), is **0 to 6 months**. A Base Offense Level of ten is stipulated in the parties' plea agreement. *See* ECF No. 18 at 3; and PSR at ¶¶ 33-43 (citing USSG §2A2.4 as applicable BOL). After a two-level reduction for acceptance of responsibility, and another two-level subtraction for the newly-enacted zero-point offender Guideline (per USSG §4C1.1) – Mr. Williams' Total Offense Level is 6. When coupled with a Criminal History Category I (0 points), yields a **0-6 months'** Guideline Range. *Id.* at ¶¶ 33-43, and 46.

### Custody Status

Mr. Williams is not presently in custody. He was "arrested" for purposes of the instant offense on August 29, 2023, after making his Rule 5 initial appearance in the Eastern District of Washington. ECF No. 5. ¶ Mr. Williams remains at liberty and resides in Spokane, Washington. He was released by the magistrate court in the Eastern District of Washington that same day on August 29, 2023 – and has thus spent 1 day in custody

for the purposes of the instant offense. [3] To date, Mr. Williams remains in recent compliance with all conditions of his pretrial release in both the Eastern District of Washington and the District of Columbia; and would request that if a custodial sentence is imposed he be permitted to self-report to the FDC-SeaTac which is located in the Western District of Washington.

**Sentencing Considerations**

Taking into account the applicable 18 U.S.C. § 3553(a) factors the requested sentence is "sufficient, but not greater than necessary." The Court should consider several factors in fashioning an appropriate sentence in Mr. Williams' case.

### 1. The Nature and Circumstances of the Offense

Mr. Williams conduct is adequately described in detail in both the Statement of the Offense (ECF No. 19) and the final PSR (¶¶ 21-26). Exhibit B also describes the offense conduct in detail from Mr. Williams point of view. *See* Exhibit B at 20-21. Mr. Williams, age 18 at the time of the offense made a last second decision (literally between the hours of 1:00-3:00 a.m. on January 5) to fly to Washington D.C., on January 5, 2021. He was receiving news from YouTube and was convinced there was ballot fraud. As a devotee of

---

[3] Mr. Williams understands that the Court may believe a custodial sentence is warranted. In that event, he asks the Court to impose a longer a period of probation (no more than 3 years as recommended by the U.S. Probation Office) and a period of home detention (no more than 30 days). Additionally, the Court could order community service as recommended by the Government (60 hours).

**Sentencing Memorandum - 3**

then-President Trump, Mr. Williams purpose in travelling to Washington, D.C., was to attend the "Stop the Steal" Rally. While in the airport he found other Trump supporters. And from here on out Mr. Williams essentially followed what President Trump told him to do. He also glommed on to other followers at the airport.

According to Mr. Williams recollection, after attending President Trump's rally at the Ellipse, the plan was to return to his hotel. However, and emboldened by Trump, he made the fateful decision to march toward the Capitol – after hearing the following snippets "We must stop the steal," followed by "we can't allow these people to illegally take over our country" and "if you don't fight like hell, you won't have a country."

Mr. Williams marched toward the Capitol to in his words "stand up for our Constitution." He entered through the Senate Wing Door, and by his account, which he freely told FBI Investigators after his arrest, consisted of him walking through the building from the inside. Mr. Williams maintains that he was under the mistaken belief that initially, the police allowed him inside. He now understands this was a mistake and recounted to Dr. Cosby that he should have protested legally. Exhibit B at 22.

The Government devotes much of its sentencing memorandum to the fact that Mr. Williams went in and then out of the Capitol twice. That is true – that he exited and then re-entered. Mr. Williams version is that he re-entered the Capitol because at the time of the exit he was part of a large crowd that he could not get free and was essentially pushed back inside. Having been pushed back inside, does not explain his behavior chanting in

the Senate Wing. However, as will be argued infra, Mr. Williams behavior can be attributed to his young age and immaturity and undiagnosed autism spectrum disorder. The Court should find that the nature and circumstances of the offense do not warrant a jail sentence.

### 2.  Mr. Williams' Background

Mr. Williams, now age 21, was born in Wichita Falls, Texas.  He is the oldest of four children born to Leslyn Rowley (formerly Williams) (age 54) and Patrick Williams (age 58).

Elliot's mother is employed at Brentwood Elementary School as a school nurse. Elliot's father works as an administrator with the Veterans Administration in Hamlet, North Carolina.  He retired from the U.S. Air Force after 26 years as a colonel approximately nine years ago.

Elliot's parents separated in 2021 and divorced in December 2022, not long after Elliot reached adulthood and began living on his own.  While Elliot did not expect them to divorce, he stated, "I barely have thought about it."  When asked why they divorced Elliot responded, "I don't remember why they divorced."  He displayed no emotion or distress.  When asked how their divorce affected him, he responded, "No impact.  No effect because I didn't live with them anymore."  When asked if he is close to his parents Elliot replied, "We are close, I guess.  I don't have much for reference.  There is no hate or anything."

Leslyn explained that in 2019 as the COVID epidemic approached and took center stage, her husband had stopped coming home from work until later in the evening. She eventually learned he was having an extra-marital affair. As their marriage was ending, Patrick relocated with his paramour to North Carolina. Leslyn has since observed rather minimal contact between Patrick and their four children, although Patrick indicated he had spoken with Elliot as recently.

Elliot's younger siblings are Alexia Williams, age 19, who is attending the University of Washington in Seattle; Oliver Williams, age 18, and A.W., age 14, both of whom are attending Mead High School in Mead, Washington. When asked if Elliot feels close to his siblings he replied, "Close enough, I guess. Nothing to compare to."

Elliott indicated his family moved frequently until he was in the sixth grade because of his father's military service. After that time, the family maintained a stable residence in Spokane.

Elliot advised both parents disciplined him, and he never had the feeling that it was excessive. It rarely involved a spanking; otherwise, it involved losing privileges or possessions for a period of time. He maintained he generally did not engage in behaviors that placed him in conflict with his parents' rules. Elliot stated he suffered no form of abuse – not verbal, emotional, physical, or sexual. When asked if he felt loved by his parents Elliot stated, "I don't know, I guess, not much to compare to." He added, "If you are too emotional it can be a disability."

Leslyn and Patrick agreed that Elliot is intellectually brilliant, emotionally shallow, impulsive, and immature.  They both have wondered if he is on the autism spectrum, and a variety of educators have brought up this possibility to them.  There also have been consistent comments about attention-deficit hyperactivity disorder (ADHD), in fact, Elliot's grandmother also thought that is a problem area for Elliot.

When asked if either parent had issues with mental or emotional health Elliot advised, "They wouldn't tell me if they did.  My Mom said my Dad did after their divorce.  She was probably making that up."  He has no awareness of either parent struggling with any form of substance abuse.  To his knowledge, neither has had legal problems but added, "They didn't ever talk about their feelings, and I never initiated."

Elliot was asked if he had witnessed any violence in his neighborhood.  He responded, "I would not have been told about it if there was.  There is lots they [Elliot's parents] never discussed, finances, etc."

Elliot indicated he was not bullied in school, although his said his mother felt he was bullied in later elementary school.  He is not sure why his mother holds that opinion.

Politics were not overtly discussed in Elliot's home.  He stated, "My parents didn't talk about politics.  They purposefully did not." Elliot's mother, Leslyn, stated that she decisively did not wade into politics with their children.  On the other hand, Elliot's father, Patrick, politically conservative, admittedly did watch a lot of right-leaning news.  Leslyn recalled Patrick had taken Elliot to a Trump rally in Spokane prior to the

2016 election which placed Donald Trump into the presidency.  She surmised that Elliot, being emotionally immature even yet, was impressed and amused by Donald Trump's penchant for making bold and at times outrageous statements.  Elliot was just 18 years old when he made the trip to Washington D.C.  Leslyn found it remarkable that he had made his own arrangements for the flight out, a hotel room, and managed to connect with others who were going to the rally during his plane connection through Atlanta, Georgia.

Elliot does remain in touch with both parents despite their divorce.  He feels his relationships are good.  He indicated his mother is worried about his legal situation and his Dad thinks the case does not merit charges, but he is nevertheless concerned.

Elliot stated he saw more people at the U.S. Capitol than he had ever seen in his life.  He said he "was not frightened and had helped prevent a lady from being trampled to death."  Elliot thought the reporting on the event was inaccurate.  He did see the female participant who was killed by law enforcement as she was being taken from the building.  Elliot stated, "She is the first dead person I have seen."

Elliot has had a two-year relationship with Desiree Rose.  When asked if he is serious about her, Elliot uncertainly indicated he was and then mentioned, "If I don't say [I love you] to her she gets mad so why not."

### 3.  Mr. Williams' Education

Mr. Williams graduated from Mead High School in Mead, Washington, in June 2020, with a 3.903 cumulative grade point average.  He earned 5 B's and 43 A's during

his four years of high school. His transcript does record entry into Whitworth University between September 2018 and June 2020, simultaneous with his attendance at Mead High School.

He advised he has never been diagnosed with a learning disability.  He attended school regularly and his mother carefully monitored his attendance, so he was not generally truant.

Elliot is not interested in college. He stated he learns quickly by himself and was a good student. He said he engaged in some courses that were accelerated during high school.  Leslyn and Patrick had more to say about their son's abilities and deficits.

According to Leslyn, Elliot had a rough transition when the family settled in Spokane after his father retired from the U.S. Air Force. He was in the sixth grade. He tended to "goof off in the cafeteria and do odd things like eat all the condiment packages." Around that time a teacher suggested he might have ADHD.  His behavior was so off that there was concern about him being on the autism spectrum; Leslyn has been concerned about how wearing that "label" would affect Elliot.  This continued to be broached by several educators over the years.

Leslyn thinks as a sixth grader and beyond Elliot hyped himself up to fit in with his peers.  He was very skinny and small when he was younger. Teachers consistently suspected Elliot was intellectually gifted. He was tested in the Mead School District at

one point but did not like the test giver and Leslyn suspects this is why he did not reach the criteria.

Elliot's sixth-grade teacher put him into advanced math (two grades above). As a freshman his teacher, Mr. Samson, enlisted him in teaching his math class.

When Elliot was a sophomore, he was taking Calculus AB and it was too easy for him. Leslyn gave Elliot her old Calculus book from college, and he taught himself. He took the Calculus AP exam and got a 5 (highest score) on it, even though he had no outside instruction.

Elliot was so advanced in the math and sciences that he began to take college classes at Whitworth University during his Junior year, and this continued through his Senior year. He always had participated in cross-country running and track and ran back and forth from Mead High School to Whitworth University to attend his classes.

One of Elliot's coaches had quoted Aristotle to him, "The whole is greater than the sum of its parts." Elliot wrote a two-page math proof to demonstrate that was an untrue statement and submitted it to his coach.

Leslyn reported Elliot had a graphing calculator he used in his math classes. He began writing programs for the calculator and routinely sent them to the company who had manufactured the calculator. He still tries to teach himself computer programming. During the pandemic he tutored students who were referred to him by his teachers.

Elliot also took chemistry as a senior in high school at Whitworth University.  He finished his pretest in record time and it was 100% correct. According to Leslyn, Elliot's teacher, Ms. Alora Gray, told her that Elliot was the most intelligent student she had ever taught.  Leslyn reported Ms. Gray has since retired and had given her chemistry set, including flasks and beakers, to Elliot.  These were placed in an empty storage area near the apartment Elliot and his roommate were renting and were subsequently inaccurately reported to police as part of possible methamphetamine lab.  That was determined to be incorrect, and charges were not pursued.

Leslyn reported Elliot had taken the SAT for college entrance and she thought he had gotten a perfect score.  When asked, Elliot stated he had earned an overall score of 1440 or 1460 and had gotten a perfect score in the math category.

Spokane Scholars has rewarded exceptional students each year for the past 31 years.  In that time, there have been only 4,000 Spokane Scholars, 160 of whom are chosen each year from all Spokane-area high schools.  In 2020, Elliot was awarded a $1,000 scholarship related to his exceptional performance in mathematics.  Elliot had intended to go to Eastern Washington University but would not write the essay required in the application packet, according to Leslyn. This was during COVID, and Elliot was frustrated with the mask mandate and taking classes online.  He maintains he is not interested in attending college and that he can self-teach and end up where he wants to be.  Elliot's parents both agree he is highly capable of self-directed learning.  He has the

discipline in that arena if the subject matter appeals to him.  Leslyn mentioned Elliot is hopeful he can get into engineering through his current employer, Hotstart Thermal Management.

Elliot also expressed interest in operating his own business.  He said he is trying to make circuit boards and offer faster shipping and better prices than can be had through China.

### 4.  Mr. Williams' Employment

Mr. Williams began to work at Kinja Sushi in Spokane at the age of 16 and continues to work there regularly. Leslyn confirmed this employment and stated that the owner, Sophia Lee, is very fond of Elliot but has difficulty with the English language so would be difficult to interview.

Between approximately August 2020 and February 2023, Elliot worked at Amazon and earned approximately $17 per hour. He was terminated for horseplay after three strikes. He described it as a safety violation as he jumped up to kick some boxes and it was seen by the safety manager. Leslyn confirmed this information and stressed it is yet another example of Elliot's immaturity and impulsiveness.

Since February 2023, Elliot has been working at Hotstart Thermal Management in Spokane Valley. He is earning $17 per hour and likes his job.  He explained he is building heating systems.  He identified his supervisor as Marc Taylor who wrote a letter in support.  He maintains his employment was not jeopardized by his decision to attend the

rally and go on to the U.S. Capitol. His employer remains supportive despite the pending charges.

### 5. Mr. Williams' Undiagnosed Autism Spectrum Disorder

Mr. Williams has submitted to the Court Dr. Cosby's Psychological evaluation as Exhibit B. Dr. Cosby's report is summarized thoroughly in the PSR at paragraphs 58-87. As Dr. Cosby explains, Mr. Williams meets the criteria for autism spectrum disorder. Further, it is no surprise that a high-functioning individual, such as Mr. Williams, who is intellectually gifted would go undetected where he did not struggle academically in school and instead excelled. Mr. Williams submits this is a basis for the Court to not impose a custodial sentence and explains his impressionability, impulsivity, misperception of the events of January 6, and the fact that he did not leave the Capitol sooner. Mr. Williams should be encouraged by the Court to consider using his intellectual talents for good – as he did when he tutored students. Furthermore, as Dr. Cosby opined Mr. Williams does not belong in a jail environment and would be easily preyed upon by other inmates.

### 6. Mr. Williams' Youth and Immaturity Contributed to the Offense

Mr. Williams youth and immaturity certainly contributed to the offense. The Court should take this into account and not impose a jail sentence based on youth or aberrant behavior.

It is settled law that age "may be relevant" as to whether downward departure should be granted; *Gall v. U.S.*, 552 U.S. 38 (2007) (where defendant pled plead guilty to

conspiring to distribute a large quantity of the drug ecstasy and to making a profit of $30,000 from his conduct, district court's, but where he withdrew from conspiracy after 7 months, stopped using drugs, went to college and became businessman and rehabilitated himself, and where guidelines were 30-37 months, district court's sentence of probation was reasonable in part because of defendant's youth an immaturity at time of the crime and district court's "consideration of [defendant's immaturity] find support in our cases") (citing *Roper v. Simmons*, 125 S.Ct. 1183 (2005) ("today our society views juveniles . . . as "categorically less culpable than the average criminal.... [a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions.... The susceptibility of juveniles to immature and irresponsible behavior means "their irresponsible conduct is not as morally reprehensible as that of an adult.... [t]he relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside." ); *Johnson v. Texas*, 509 U.S. 350, 367 (1993) ( jury may consider a 19-year-old defendant's youth as a mitigating factor because "youth is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and psychological damage."); *U.S. v. Feemster* 572 F.3d 455 (8th Cir. 2009)(en banc) (where defendant convicted of selling 18 ounces of crack and where he was career offender, and

guidelines 360-life, and where district court said the sentence was "excessive and would "pretty much take away his life," downward variance to 120 months, the mandatory minimum, not unreasonable because of defendant's youth—age 16, priors were youthful (ages 16-17), no weapon was present during instant offense, and he had successful completed probation on some priors—even though some of these factors taken into account by guidelines); *see also U.S. v Polito*, (5th Cir. Jan. 31, 2007 No. 06-30133) 2007 WL 313463 (unpub.) (where defendant convicted of possession of child pornography and guidelines 27-33 months, district court's sentence of probation with one year house arrest reasonable in part because defendant was 18 at time of the offense "and very immature...and his age and mental condition prohibited him from acting rationally"); *U.S. v. Naylor*, 359 F.Supp.2d 521 (W.D. Va. 2005) (citing *Roper v. Simmons*, district court reduces career offender sentence from 188 to 120 months because district court discounts the defendant's prior convictions for robberies committed during one six week period as a juvenile and reduces defendant' career offender sentence to 10 years, based also on his youth at the time of priors and fact that priors barely qualified and that sentence is "a reasonable sentence ... within the sentencing range had he not been determined to be a career offender." "Juveniles have an underdeveloped sense of responsibility, are more vulnerable to negative influences and peer pressure, and their character is not as well formed as an adult's."); *U.S. v. Allen*, 250 F.Supp.2d 317 (SDNY 2003)(Where defendant convicted of drugs and guns, defendant entitled to 8 level

departure from 80 months to 30 months because his mental immaturity-even though 21

behaves like 14 year old and psychological problems and mild retardation take case out of

heartland of drug and gun cases); *U.S. v. Stern*, 590 F.Supp.2d 945, 952 (N.D. Ohio,

2008) (in a C.P. case, sentence of twelve months and one day, which was below advisory

range of 46-57 months was sufficient but not greater than necessary to satisfy purposes of

the statutory sentencing factors; although offense was exceedingly serious in part because

defendant was 14 years old when he began his activities when defendant was immature.

"Indeed, the Court has conducted a review of the scientific literature in this area and

believes there is compelling evidence that the judicial system′s longstanding principle of

treating youth offenders differently than adult offenders is justified in part based on the

unformed nature of the adolescent brain. *See, e.g., National Institute of Health Publication*

4929, The Teenage Brain: A Work In Progress (2008))"; *United States v. Polito*, 215 Fed.

Appx. 354, 357 (5th Cir.2007) (per curiam); *U.S. v. McElheney*, 524 F.Supp.2d 983, 997

(E.D.T enn. 2007) (″Typically, defendants in [child pornography] cases are first

offenders, highly educated, middle aged, with solid work histories.″) (emphasis added).

    7. **Unwarranted Sentencing Disparities may result if a Guideline Sentence is imposed.**

      According to 18 U.S.C. § 3553(a)(6), the Court is directed avoid unwarranted

sentencing disparities among similarly situated defendants. Mr. Williams points out

unwarranted sentencing disparities would occur if the Court imposes a mid-Guideline sentence as recommended by the Government.

For example, the following individuals were convicted under 1752(a)(2) and received no further sentence of incarceration – just as the Court should do in Mr. Williams's case:

*U.S. v. Felipe Marquez*, 1:21-CR-00136-RC. Mr. Marquez was sentenced to 3 months' home detention and 18 months' probation and $500 restitution. Mr. Marquez had no criminal history; entered building, asked officers for a fist bump, and took videos.

*U.S. v. Stephen Ayres*, 1:21-CR-00156-JDB. Mr. Ayres was sentenced to 24 months' probation 100 hours' community service $500 restitution. He had no criminal history; entered the building, chanted, then left.

*U.S. v. Steven Billingsley,* 1:21-CR-00519-TFH. Mr. Billingsley was sentenced to 24 months' probation 60 hours' community service $500 restitution. He had one DV conviction; he helped undo a metal barricade, shouted and chanted, entered building, said he wanted to hurt Pelosi--said he would hang them.

*U.S. v. Hunter Palm*, 1:21-CR-00393-RDM. Mr. Palm was sentenced to 36 months' probation $500 restitution. He had no criminal history; entered building, took videos, and chanted.

**8. The suggested sentence sufficiently deters future criminal conduct.**

The Sentencing Reform Act requires that courts impose sentences that are sufficient, but no more than necessary, to "deter[] … criminal conduct[.]" 18 U.S.C. § 3553(a)(2)(B). A time-served sentence will deter Mr. Williams from future criminal proclivities.

This is Mr. Williams' first criminal conviction. He has remained in total compliance with pretrial release conditions since August of 2023. This is particularly true for someone like Mr. Williams who at age 21 has not spent any time in prison.

As for general deterrence—the idea that sentencing Mr. Williams to a harsher penalty would deter others—it does not work. As a recent study found, "a large body of prior research … casts doubt on the theory that stiffer prison terms effectively deter drug use, distribution, and other drug-law violations." [4]

But perhaps the most compelling evidence that lengthy prison sentences do not deter crime comes from the Department of Justice itself. In a May 2016 report, the Department stressed that (1) incarceration is not a very effective way to deter crime, and (2) longer sentences do little to deter crime. Here is a snippet from the report:

--------------------------------

[4] *See* http://www.pewtrusts.org/en/research-and-analysis/speeches-and-testimony/2017/06/pew-analysis-finds-no-relationship-between-drug-imprisonment-and-drug-problems.

U.S. Department of Justice
Office of Justice Programs
*National Institute of Justice*





# NATIONAL INSTITUTE OF JUSTICE
# FIVE THINGS
## ABOUT DETERRENCE

Deter would-be criminals by using scientific evidence about human behavior and perceptions about the costs, risks and rewards of crime.

**1. The *certainty* of being caught is a vastly more powerful deterrent than the punishment.**

Research shows clearly that the chance of being caught is a vastly more effective deterrent than even draconian punishment.

**2. Sending an individual convicted of a crime to prison isn't a very effective way to deter crime.**

Prisons are good for punishing criminals and keeping them off the street, but prison sentences (particularly long sentences) are unlikely to deter future crime. Prisons actually may have the opposite effect: inmates learn more effective crime strategies from each other, and time spent in prison may desensitize many to the threat of future imprisonment.

See "Understanding the Relationship Between Sentencing and Deterrence" for additional discussion on prison as an ineffective deterrent.

**4. Increasing the severity of punishment does little to deter crime.**

Laws and policies designed to deter crime by focusing mainly on increasing the severity of punishment are ineffective partly because criminals know little about the sanctions for specific crimes.

More severe punishments do not "chasten" individuals convicted of crimes, and prisons may exacerbate recidivism.

See "Understanding the Relationship Between Sentencing and Deterrence" for additional discussion on the severity of punishment.

**5. There is no proof that the death penalty deters criminals.**

According to the National Academy of Sciences, "Research on the deterrent ... e about whether capital

The requested sentence is sufficient to achieve deterrence. Any further sentence would be unnecessary.

**Sentencing Memorandum - 19**

### 9. USSG §4C1.1 for Zero Point Offenders should be Applied and not Discounted as Argued by the Government

The newly enacted Guideline for Zero Point Offenders should be considered and not discounted as argued by the Government.

On April 27, 2023, after a lengthy hiatus, the U.S Sentencing Commission adopted guideline amendments to Congress. The 2023 amendments took effect on November 1, 2023.

USSG §4C1.1 reduces the offense level by two levels for zero-point offenders with no prior criminal history and no aggravating factors in their current offense. This adjustment is based on studies showing lower recidivism rates among zero-point offenders. Section 4C1.1 applies to various categories of zero-point offenders, including those without prior convictions, those with prior convictions outside the defined time limits, and those with prior convictions not used for calculating the criminal history category. Exclusion criteria exist for serious offenses or offenses involving violence or sex offenses. The amendment also revises the Commentary to §5C1.1, allowing non-imprisonment sentences for defendants receiving the §4C1.1 adjustment within Zone A or B of the Sentencing Table. Departures are permitted when the guideline range overstates the offense's gravity due to the absence of violence or serious offenses.

Given the recommended guideline, Mr. Williams qualifies for the newly created §4C1.1 two-level reduction for qualification as a "zero-point offender." If the

amendment is applied and not discounted, the total adjusted offense level in this case would be a 6. With a criminal history category of I, the guideline range is **0 to 6 months.** Mr. Williams argues this proposed amendment further militates in favor of a sentence of non-imprisonment – due to his low risk of recidivism which the Commission now recognizes with the newly enacted amendment.

### Conclusion

The Court should impose a sentence of time-served, followed by one (1) year of supervised release, no criminal fine, a $25 special penalty assessment; and restitution in the amount of $500. The requested sentence will punish Mr. Williams sufficiently, but not more than is necessary given the facts and circumstances of his case.

Dated:   April 12, 2024

Respectfully Submitted,

*/s/ J. Stephen Roberts, Jr.*
J. Stephen Roberts, Jr., WA 45825
Attorneys for Elliot P. Williams
Federal Defenders of
Eastern Washington and Idaho
601 W. Riverside Ave., Ste. 900
Spokane, Washington 99201
(509) 624-7606
(509) 747-3539
Email:  Steve_Roberts@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on April 12, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following: Melanie Krebs-Pilotti, Assistant United States Attorney.

*/s/ J. Stephen Roberts, Jr.*
J. Stephen Roberts, Jr., WA 45825
Attorneys for Elliot P. Williams
Federal Defenders of
Eastern Washington and Idaho
601 W. Riverside Ave., Ste. 900
Spokane, Washington 99201
(509) 624-7606
(509) 747-3539
Email:  Steve_Roberts@fd.org
